# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8002 | **DATE** | 11/5/2001 |
| **CASE TITLE** | | Johnson-Carter, et al. vs. B.D.O. Seidman, LLP | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions for summary judgment against all four plaintiffs are granted. Judgment is entered in favor of the defendant and against the plaintiffs. The Clerk is directed to terminate motions [18-1, 23-1, 26-1 and 10-1 which was mistakenly filed under 01 C 2355].

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | number of notices | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | NOV 05 2001 | |
| | Notified counsel by telephone. | | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | | |
| ✓ | Mail AO 450 form. | | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | date mailed notice | |
| RO | courtroom deputy's initials | | NOV -5 PM 1: 07 | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **ROBBIN JOHNSON-CARTER,** <br> **SANDRA E. CARTER, KENDRA AGUIRRE,** <br> **and ELIZABETH COY,** | ) ) ) |
| **Plaintiffs,** | ) ) **No. 00 C 8002** |
| **v.** | ) ) **Judge Ruben Castillo** |
| **B.D.O. SEIDMAN, LLP, a Limited Liability** <br> **Partnership,** | ) ) ) |
| **Defendant.** | ) |

*DOCKETED NOV - 5 2001*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Robbin Johnson-Carter ("Johnson-Carter"), Sandra E. Carter ("Carter"),

Kendra Aguirre and Elizabeth Coy sue B.D.O. Seidman, LLP ("BDO") for race and national

origin discrimination[1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e *et seq.* and 42 U.S.C. § 1981.[2]  Three of the four plaintiffs, Johnson-Carter, Aguirre and

Coy, allege that BDO discriminated against them in terminating their positions.  In addition,

Plaintiffs Johnson-Carter and Carter each allege harassment and discrimination in the terms and

conditions of their employment.  Carter also alleges that she was forced to resign her position

because of the alleged discriminatory treatment and harassment.  Currently before the Court are

---

[1] Plaintiffs Johnson-Carter, Carter and Aguirre are African-American and allege race
discrimination.  Plaintiff Coy is Hispanic and alleges national origin discrimination.

[2] On December 21, 2000, Plaintiffs, former employees of BDO, filed a consolidated
complaint against BDO, each alleging various discrimination claims based on race or national
origin.  On February 27, 2001, the Court granted Defendant's motion to sever for misjoinder of
Plaintiffs, dismissing the consolidated complaint.  On April 11, 2001, the Court vacated the
dismissal of the consolidated complaint and later resumed jurisdiction over all four Plaintiffs'
claims.  In this consolidated opinion, we will address each Plaintiff individually.

*49*

BDO's motions for summary judgment against all four Plaintiffs on all claims. For the reasons stated below, Defendant's motions for summary judgment are granted. (R. 18-1, Johnson-Carter; R. 23-1, Coy; R. 10-1, Aguirre; R. 26-1, Carter.)

### RELEVANT FACTS[3]

## I. Robbin Johnson-Carter

### A. Background

In April 1998, BDO, a national accounting and consulting firm, hired Plaintiff Robbin Johnson-Carter as a Performance Development Manager in BDO's Center for Performance Development ("CPD"). (R. 20, Def.'s Statement of Facts ¶¶ 1, 6.) As a Performance Development Manager at the CPD, Johnson-Carter designed programs and materials for training BDO partners and employees. (*Id.* at ¶¶ 8, 9.)

Around March or April 1999, approximately one year after Johnson-Carter was hired, Julie Harter became head of the CPD and shortly thereafter reorganized the department. (*Id.* at ¶¶ 11, 13.) Harter divided the department into two subgroups, program development and program delivery. (*Id.* at ¶ 13.) Johnson-Carter formed part of the program development subgroup, along with three other Program Development Managers, Mary Farias, Mark Mayberry and Carol Steele. (*Id.* at ¶ 16.) Farias managed the tax training programs, Mayberry managed the assurance programs, including auditing and accounting, and Steele managed the programs used by Business Technology Solutions ("BTS"), a distinct information consulting line within BDO. (*Id.* at ¶¶ 17-19.) Johnson-Carter originally managed a program known as the HR

---

[3] These facts are derived from the parties' statements filed pursuant to Local Rule 56.1. Unless otherwise indicated, the facts included herein are undisputed.

Competency Model, but later became the project manager for assurance training programs when Mayberry transferred out of the CPD. (*Id*. at ¶¶ 20, 21.)

In July 1999, BDO hired Rod Mebane to head the CPD. (*Id*. at ¶ 30.) Shortly after arriving at BDO, Mebane asked Johnson-Carter, Farias and Steele to submit progress reports on their current projects. (*Id*. at ¶ 36.) At the time, Johnson-Carter was working on four different auditing training courses. (*Id*. at ¶ 37.) After reviewing Johnson-Carter's project report, Mebane determined that she was experiencing difficulty keeping projects on schedule, what he termed "schedule slippage." (*Id*. at ¶ 38 (citing Mebane Dep. at 27-28).) In addition, BDO alleges that at that time Mebane did not observe any "schedule slippage" in Farias or Steele's projects. (*Id*. at ¶ 39.) In light of the submitted project reports, Mebane reevaluated each manager's workload and in an August 6, 1999 memorandum, reassigned two of Johnson-Carter's auditing projects to Farias and another two projects to the program delivery subgroup. (*Id*. at ¶¶ 42, 43.) In the same memorandum, Mebane stated that the reassignment would allow Johnson-Carter to commit more time to the first level of the auditing training courses, Audit Level I. (*Id*. at ¶ 44.) BDO also alleges that the remaining auditing projects were back on schedule after reassignment. (*Id*. at ¶ 45.)

## B. Evaluations of Plaintiff's Performance

Around July 27, 1999, Mike Ross, an outside consultant, met with Johnson-Carter to review her performance and provide feedback, which he summarized in a memorandum. (*Id*. at ¶¶ 23, 24.) In the memorandum, Ross encouraged Johnson-Carter to continue designing practical programs and speaking her mind, but he also made a number of critical comments regarding work style and productivity, noting that Johnson-Carter's approach was not structured enough and that

she was not as productive as she could be. (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab E, Performance Feedback Memorandum.) Johnson-Carter does not dispute that Ross honestly believed she was not as productive as she could or should be. (R. 20, Def.'s Statement of Facts ¶ 26 (citing Johnson-Carter Dep. at 75-76).)

Around August 2, 1999, Johnson-Carter's performance was again reviewed, on this occasion by Harter. (*Id.* at ¶ 33.) Among other observations, Harter's evaluation stated: "Sometimes it seems as though you are hesitant to take the initiative on projects or processes. Given our limited resources, it is vital that you step up to the plate as much as possible and provide leadership." (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab F, Performance Review.) Again, Johnson-Carter does not doubt that Harter honestly believed she was lacking initiative on projects. (R. 20, Def.'s Statement of Facts ¶ 35 (citing Johnson-Carter Dep. at 85-86).)

At an unspecified point prior to Mebane's hire, Johnson-Carter received a bonus recommended by an unidentified former head of the CPD. (R. 36-3, Johnson-Carter Add'l Facts ¶ 2.) Johnson-Carter also alleges that she received an above average performance review. (*Id.*)

In mid-August 1999, Mebane requested that each member of the CPD complete a self and team evaluation. (*Id.* at ¶ 40.) Johnson-Carter completed the evaluation, rating herself as "needs improvement" in some areas, but as better than the team in other areas. (R. 21, Def.'s App. in Supp. of Mot. for Summ. J., Tab G, CPD Team Evaluation.)

Johnson-Carter's performance was next evaluated on October 19, 1999, when Mebane met with her to discuss the Audit Level I project. (*Id.* at ¶¶ 46, 47.) BDO alleges that when Mebane met with Johnson-Carter, he was dissatisfied with her performance because of schedule slippage,

lack of organization and a clear work plan and failure to communicate when she was experiencing problems. (*Id.* at ¶ 48, 49.) Mebane, however, failed to communicate these concerns at the meeting and addressed them in a later memorandum. (R. 36-3, Johnson-Carter Add'l Facts ¶ 6.) Johnson-Carter does not dispute that during the meeting she agreed with Mebane that her contribution to the Audit Level I project was not adding value commensurate with the time she was spending on it. (R. 36-2, Johnson-Carter Statement of Facts ¶¶ 50, 51.) Johnson-Carter told Mebane that she was simply fulfilling the role that had been defined for her by a BDO partner working on the project and could offer limited value since she lacked an auditing background. (R. 20, Def.'s Statement of Facts ¶¶ 51, 52.) Mebane responded by arguing that an instructional designer[4], with the help of a subject matter expert, should be able to add value to a project without having expertise in the subject matter. (*Id.* at ¶ 53.)

Mebane concluded the October 19,1999 meeting by assigning Johnson-Carter a new management development project to focus on during the month of November. (*Id.* at ¶ 57.) Mebane told her she should use the new project to prove that she could be a valuable member of the CPD team, which Johnson-Carter considered to be a fair arrangement. (*Id.* at ¶¶ 58, 59.) As agreed, Johnson-Carter submitted a plan on leadership development within a few days. (*Id.* at ¶ 61.) BDO alleges, however, that Mebane was not satisfied with the plan and did not consider it implementable. (*Id.* at ¶ 62.) The plan focused on leadership development, rather than management development, which Mebane considered to be a different subject. (*Id.* at ¶ 63.)

---

[4] Performance Development Managers are also referred to as instructional designers in both parties' briefs and in this opinion.

## C. Johnson-Carter's Allegations of Harassment and Discriminatory Treatment

In her Amended Complaint, Johnson-Carter alleges various instances of discriminatory treatment at BDO. First, Johnson-Carter alleges that she was denied training opportunities that were given to non-African-Americans. (R. 10-1, Johnson-Carter Am. Compl. ¶ 10A.) On three occasions in November 1999, Johnson-Carter asked Mebane if she could attend an outside leadership training program in December 1999. (R. 20, Def.'s Statement of Facts ¶ 111.) Mebane knew that Johnson-Carter already had expertise in leadership development training and told her he would think about her request. (*Id.* at ¶ 112.) Johnson-Carter never received Mebane's approval to attend the training program. (*Id.* at ¶ 113.) According to Johnson-Carter, co-workers Farias and Steele were allowed to attend outside training on one occasion. (*Id.* at ¶ 110.)

Second, Johnson-Carter alleges that she was subject to verbal attacks by co-workers. (R. 10-1, Johnson-Carter Am. Compl. ¶ 10B.) On an unspecified date, co-worker Brenda Huddleston yelled at Johnson-Carter that she was not doing her job. (R. 20, Def's Statement of Facts ¶ 89.) Johnson-Carter complained to Mebane, who agreed to talk to Huddleston. (*Id.* at ¶¶ 90-91.) Although Johnson-Carter does not know if Mebane spoke with Huddleston about the incident, Huddleston subsequently refrained from making any other comments that Johnson-Carter considered inappropriate. (*Id.* at ¶ 92.)

Third, Johnson-Carter alleges that she was not invited to attend staff meetings. (R. 10-1, Johnson-Carter Am. Compl. ¶ 10C.) Although on some occasions Johnson-Carter attended meetings with Mebane, Farias, Huddleston and Steele, on approximately three occasions, she observed Mebane meeting only with Farias, Huddleston and Steele. (R. 20, Def.'s Statement of

Facts ¶¶ 104, 107.)  Johnson-Carter was not invited to attend these three meetings and does not

know what was discussed in them.  (*Id.* at ¶¶ 105-106.)

Fourth, Johnson-Carter alleges that co-workers made negative comments to her about her

"people" and her neighborhood. (R. 10-1, Johnson-Carter Am. Compl. ¶ 10D.)  On one occasion,

around July 1999, co-worker Darren Nieman, upon seeing Johnson-Carter's daughter's braided

hairstyle with multi-colored barrettes, asked Johnson-Carter, "Why do you people decorate

yourselves?" (R. 20, Def.'s Statement of Facts ¶ 84 (citing Johnson-Carter Dep. at 91).)

Approximately two weeks after the incident, Johnson-Carter reported the incident to Harter.

Although Johnson-Carter does not know if Harter spoke with Nieman regarding the inappropriate

comment, Nieman thereafter refrained from making other offensive comments. (*Id.* at ¶¶ 87, 88.)

On another occasion, Harter herself made a comment that Johnson-Carter considered to be

racially discriminatory.  While a group of BDO employees discussed Chicago neighborhoods,

Harter commented that Johnson-Carter's neighborhood, East Rogers Park, was a "very bad

neighborhood." (*Id.* at ¶¶ 97, 99 (citing Johnson-Carter Dep. at 224).)  Johnson-Carter considered

the comment to be racial because each of the neighborhoods identified in the conversation, Pilsen,

Englewood and the South Side of Chicago, have a high percentage of minorities. (*Id.* at ¶ 100.)

In addition to the instances of discriminatory treatment alleged in her Amended

Complaint, Johnson-Carter also alleges that she was: (1) the only instructional designer required

to work outside her area of expertise, (R. 36-3, Johnson-Carter Add'l Facts ¶ 7); (2) denied her

request for two compensatory days off, (R. 20, Def.'s Statement of Facts ¶¶ 108, 109); and (3)

denied performance feedback, (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab A, Johnson-

Carter Dep. at 179-185).

## D. Reorganization of BDO and Termination of Johnson-Carter's Employment

The heart of Johnson-Carter's suit is her claim that BDO discriminated against her in terminating her employment.[5] In December 1999, Johnson-Carter began hearing rumors that BDO was going to reorganize. (R. 20, Def.'s Statement of Facts ¶ 68.) BDO argues that by early December 1999, Mebane had decided that the company should outsource its instructional design work to cut costs. (*Id.* ¶ 70.) In mid-January 2000, Mebane formally recommended that the instructional design work be outsourced and that the positions of Johnson-Carter and Steele be eliminated.[6] (*Id.* at ¶ 71.) Mebane's recommendation was approved and on February 17, 2000, he informed Johnson-Carter that her position was being eliminated. (*Id.* at ¶ 72.) When Mebane informed Johnson-Carter of her position elimination, he also gave her a job description for a trainer position in BDO's New York office, which she did not pursue because she wanted to remain in Chicago. (*Id.* at ¶¶ 73, 74.) Mebane also told Johnson-Carter that her termination was not performance related. (R. 36-3, Johnson-Carter Add'l Facts ¶ 9.)

The position of Carol Steele, the other instructional designer, was also eliminated, although she received an offer to work with BTS. (*Id.* at ¶¶ 77, 79.) As part of its reorganization,

---

[5] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment only addresses Johnson-Carter's termination claim and does not address the other discrimination or harassment claims. (*See* R. 36-1, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J.) The Court will not treat other claims as abandoned, as BDO argues, (R. 38, Def.'s Reply at 2), and will address all of Johnson-Carter's claims in the analysis.

[6] Farias, the third instructional designer, had already been transferred to another position, Knowledge Manager, effective January 1, 2000. (R. 20, Def.'s Statement of Facts ¶ 67.) BDO alleges that in late November 1999, Mebane began to consider creating the position – an employee who would be responsible for codifying employees' expertise or knowledge so it could then be shared with others. (*Id.* at ¶ 68.) Mebane wanted Farias to fill the position because he believed she had excellent organizational and research skills. (*Id.* at ¶ 66.)

BDO decided to "spin off" BTS, the information technology business for which Steele designed training. (*Id.* at ¶ 78.) BDO alleges that BTS invited Steele to join it, and that Mebane had no part in BTS's decision to offer Steele a position. (*Id.* at ¶¶ 79, 80.)

In addition to Johnson-Carter and Steele, the positions of the following BDO employees were also eliminated due to the reorganization: Kendra Aguirre, Elizabeth Coy, Jessica Gutierrez, Julie Harter, Warren Holmes, Craig Johnston, Anna Montez, Karen Schmidt, and Samuel Vitkoski. (*Id.* at ¶ 81.) Johnson-Carter alleges that on February 17, 2000, the day of her termination, only Hispanic and African-American employees (Gutierrez, Montez and Aguirre) of the CPD were let go. (R. 36-3, Johnson-Carter Add'l Facts ¶ 8.) BDO responds that only Montez worked in the CPD. (R. 40, Def.'s Resp. to Johnson-Carter.'s Add'l Facts ¶ 8.) From the record, it is clear that Montez worked in the CPD, (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab A, Johnson-Carter Dep. at 46), and Aguirre worked in Human Resources (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab D, Forgue Aff.), but it is unclear in which department Gutierrez worked, (*id.*).

On September 4, 2000, Johnson-Carter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (R. 10-1, Johnson-Carter Am. Compl. ¶ 3.) The EEOC issued a right to sue letter on September 29, 2000, which Johnson-Carter received on October 3, 2000. (*Id.*) On December 21, 2000, Johnson-Carter filed a complaint with this Court.

## II. Sandra Carter

### A. Background

In October 1998, Plaintiff Sandra E. Carter began working as an executive assistant in BDO's legal department. (R. 27, Def.'s Statement of Facts ¶¶ 4, 11.) At the time of her hire,

Carter performed general secretarial work for General Counsel Scott Univer and his legal team, including attorney Joanna Moore. (*Id.* at ¶¶ 9, 14.) When Judith Grimmer joined the BDO legal team in December 1998, Carter also supported her. (*Id.* at ¶ 12.) In February 2000, Carter's team changed when Laura O'Neill was hired to replace Moore and Univer was moved to another floor. (*Id.* at ¶¶ 47-50.) As of February 2000, Carter worked only for Grimmer and O'Neill. (*Id.* at ¶ 53.)

**B. Carter's Allegations of Discriminatory Treatment**

Carter alleges several instances of discriminatory treatment. First, Carter alleges that, unlike her Caucasian co-workers, she was required to do personal business for executives. (R. 10-2, Carter Am. Compl. ¶ 11B.) On two unspecified dates, Carter faxed and sent by messenger personal documents for O'Neill. (R. 27, Def.'s Statement of Facts ¶¶ 61, 62.) Second, Carter alleges that she was told not to discuss work-related problems with anyone outside her department. (R. 10-2, Carter Am. Compl. ¶ 11C.)

Third, Carter alleges that her whereabouts during the workday were monitored. (R. 10-2, Carter Am. Compl. ¶ 11D.) After Univer moved floors, Grimmer and O'Neill required Carter to check in with them when she arrived in the morning and before she left in the afternoon, and also when leaving and returning from lunch. (R. 27, Def.'s Statement of Facts ¶¶ 54-55.) Fourth, Carter alleges that she was ignored by "certain Human Resources attorneys." (R. 10-2, Carter Am. Compl. ¶ 11E.)

Fifth, Carter alleges that, unlike her Caucasian co-workers, she was required to stay later than 5:00 p.m. and to cancel plans at the last minute. (R. 10-2, Carter Am. Compl. ¶11F.) On two occasions in approximately February or March 1999, Grimmer asked Carter to stay past 5:00 p.m.

to prepare letters for overnight delivery.  (R. 27, Def.'s Statement of Facts ¶¶ 30, 32.)  Although

Carter stayed and did the work on both occasions, she complained to Grimmer and O'Neill about

the lack of notice.  (*Id.* at ¶¶ 31, 34, 35.)  Grimmer responded that she would try to give more

notice in the future.  (*Id.* at ¶ 36.)  Finally, Carter alleges that she was yelled at and berated by

attorneys Grimmer and O'Neill.  (R. 27, Def.'s Statement of Facts  ¶¶ 25-29, 64.)

### C.  Carter's Resignation

Carter's final two discrimination claims arise out of the events surrounding her resignation

in March 2000.  Carter claims that she was discriminated against when her position was changed

from executive assistant to administrative assistant/clerk, and when Grimmer told her she was

required to affirmatively commit to the newly-defined job.  (R. 10-2, Carter Am. Compl. ¶¶ 11A,

11G; R. 37-2, Carter Statement of Facts ¶ 70 (citing Carter Dep. at 162-163).)  On March 21,

2000, Grimmer and O'Neill met with Carter to discuss her job duties in light of Univer's

relocation, and they provided her with a job description.  (R. 27, Def.'s Statement of Facts ¶¶ 66,

67.)  Although BDO alleges that the duties in the job description were substantially the same as

Carter's existing duties, Carter responds that the new job description contained another page of

additional responsibilities.  (*Id.* at ¶ 69; R. 37-2, Carter Statement of Facts ¶ 69.)  During the

meeting, Carter voiced concerns about staying past 5:00 p.m. and the effect of overtime work on

her train schedule.  (R. 37-2, Carter Statement of Facts ¶ 73 (citing Carter Dep. at 152, 160).)

Carter requested some time to look over the job description, to which Grimmer and O'Neill

agreed.  (R. 27, Def.'s Statement of Facts ¶ 77.)

The next day, March 22, 2000, Grimmer and O'Neill met with Carter at her request to

further discuss the job description.  (*Id.* at ¶ 79.)  Carter again raised concerns about having to stay

11

later than 5:00 p.m. (*Id.* at ¶ 79.) Grimmer and O'Neill responded that they needed someone who was available to work overtime and was enthusiastic about the job. (*Id.* at ¶¶ 79, 80.) They also told Carter that she needed to think about whether she really wanted to do the job. (*Id.* at ¶ 80.) Both Grimmer and O'Neill denied, when asked by Carter, that they were trying to get rid of her or fire her. (*Id.* at ¶ 81.) Carter again requested more time to think about the job description, which Grimmer and O'Neill agreed to, provided that she make a decision by Friday, March 24, 2000. (*Id.* at ¶ 82.) The parties dispute what happened at the end of the work day on March 24. BDO alleges that Carter left work at 5:00 p.m. without telling Grimmer or O'Neill if she wanted the job. (*Id.* at ¶ 83.) Carter alleges that she went to Grimmer's office at 5:00 p.m., but that Grimmer was on the telephone and signaled to Carter that she could leave. (R. 37-2, Carter Statement of Facts ¶ 83.)

On March 27, 2000, Grimmer arranged a meeting with Carter and Office Manager Kevin Roberts. (*Id.* at ¶ 84.) Grimmer reminded Carter of the March 24 deadline and again asked Carter if she wanted the job. (*Id.* at ¶ 85.) When Carter stated that she was doing everything Grimmer and O'Neill asked of her, Grimmer responded, "I want you to say that you want the job and quit playing with words." (*Id.* at ¶ 88 (citing Carter Dep. 212).) Carter refused to say that she wanted the job, and asked if Grimmer was firing her. (*Id.* at ¶¶ 89, 90.) Grimmer denied that she was firing Carter, and Roberts also reiterated that Carter was not being fired. (*Id.* at ¶¶ 90, 91.) After the meeting, Carter worked the rest of the day without incident. (*Id.* at ¶ 92.)

The following day, March 28, 2000, Carter gave Grimmer and Roberts a memorandum stating that she was resigning effective immediately. (*Id.* at ¶ 93.) Carter considered her working conditions intolerable because Grimmer and O'Neill required her to check in when she arrived at

and left her desk, yelled at and berated her, gave her additional responsibilities along with a less

distinguished job title and required Carter to affirmatively commit to the newly-described

position. (R. 37-1, Carter.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 9-10.)

On July 24, 2000, Carter filed a charge of discrimination with the EEOC. (R. 10-2, Carter

Am. Compl. ¶ 3.) The EEOC issued a right to sue letter on September 29, 2000, which Carter

received on October 3, 2000. (*Id.*) On December 21, 2000, Carter filed a complaint with this

Court.

## III. Kendra Aguirre

### A. Background

In March 1998, Plaintiff Kendra Aguirre began her employment as an administrative

assistant/receptionist in BDO's national office in Chicago. (R. 24-B, Def.'s Statement of Facts

¶¶ 2, 11.) As an administrative assistant/receptionist, Aguirre performed receptionist duties and

secretarial work for supervisor Toni Lawrence (*Id.* at ¶ 13.) Aguirre had a clean work record at

BDO. (R. 33-2, Aguirre Add'l Facts ¶ 1.) She was never reprimanded and never written up. (*Id.*)

Before Aguirre began her employment with BDO, she had approximately seven years of

experience in retail sales positions, approximately one year of experience as a telephone

interviewer and approximately eight years experience as a receptionist/area coordinator with

customer service responsibilities. (R. 24-B, Def.'s Statement of Facts ¶¶ 6-9, 11, 13.) Aguirre

has an associate's degree in retail management. (*Id.* at ¶ 5.)

Three to four months after Aguirre began her employment at BDO, Lawrence offered and

Aguirre accepted a promotion to the position of Human Resources Coordinator. (*Id.* at ¶ 14).

Aguirre's responsibilities as a Human Resources Coordinator included interacting with outside

staffing sources to fill BDO administrative positions, handling new hire orientations, distributing

paychecks and other administrative human resources duties. (*Id.* at ¶ 23.) During the last six

months of her employment, Aguirre devoted forty percent of her time to payroll responsibilities.

(*Id.* at ¶ 25.)

BDO argues that Aguirre had no prior human resources experience. (*Id.* at ¶ 15.) Aguirre,

however, asserts that although she had no human resources experience in a corporate

environment, she did have "some human resources responsibilities when she worked in retail."

(R. 33-1, Aguirre Statement of Facts ¶ 15 (citing Aguirre Dep. at 40).) BDO responds that this

experience was minimal – i.e. sitting in on job interviews. (R. 47, Def.'s Reply to Aguirre

Statement of Facts ¶ 15.) BDO also argues that Aguirre has no educational background in human

resources although Aguirre asserts that she took some basic business-related courses in college.

(R. 24-B, Def.'s Statement of Facts ¶ 16; R. 33-1, Aguirre Statement of Facts ¶ 16.)

**B. Aguirre's Termination**

On February 17, 2000, Aguirre learned that her position was eliminated and that her

employment with BDO was terminated. (R. 24-B, Def.'s Statement of Facts ¶ 32.) In December

1999, BDO began to examine and to reorganize the staffing in its executive and national offices.

(*Id.* at ¶ 27.) Ken Mooney, BDO's Director of Operations, and Marty McLaughlin, BDO's Chief

of Staff, "determined that Aguirre's position could be eliminated because some of her duties and

functions were eliminated, and her remaining duties and responsibilities could be assumed by

others in the restructured BDO human resources and office administration organizations." (*Id.* at

¶ 31.) Aguirre denies part of this assertion by arguing that her responsibilities as Human

Resources Coordinator were impossible to eliminate since they were functions necessary for running an efficient office and staff. (R. 33-1, Aguirre Statement of Facts ¶ 31).

The parties dispute whether there were other positions available within BDO for which Aguirre was qualified at the time of her termination. Aguirre argues that she was aware of available administrative positions, but that she "was asked to leave the company so abruptly that she had no chance to apply for such jobs." (R. 33-1, Aguirre Statement of Facts ¶ 34.) In response, BDO points out that at her deposition, Aguirre testified that she was not qualified for any of the positions open at the time of her termination. (R. 47, Def.'s Reply to Aguirre Statement of Facts ¶ 34 (citing Aguirre Dep. at 92).)

## C. Aguirre's Allegations of Discriminatory Treatment

On the day of Aguirre's termination, Robbin Johnson-Carter, Anna Montez, and Jessica Gutierrez were also terminated. (R. 33-2, Aguirre Add'l Facts ¶ 6.) Aguirre specifically takes issue with the following Caucasian employees whose positions were not terminated during BDO's reorganization: Sonny D'Agostin and Virginia Wise. BDO notes that another employee, Denise Rieckmann, also was retained in BDO's reorganization. (R. 24-B, Def.'s Statement of Facts ¶¶ 39, 43.) Prior to the reorganization, both Rieckmann and D'Agostin worked in BDO's National Recruiting Group, the group responsible for establishing and implementing recruiting policies and procedures (*Id.* at ¶¶ 36, 39, 45.) Before Rieckmann began working at BDO, she worked as a recruiter of accounting and other professionals for three different recruiting firms. (*Id.* at ¶ 40.) D'Agostin was an Administrative Assistant in the National Recruiting Group. (*Id.* at ¶ 45.) In this position, D'Agostin performed administrative assistant duties for Rieckmann and other members of the National Recruiting Group. (*Id.* at ¶ 46.)

15

On September 14, 2000, Aguirre filed a Charge of Discrimination with the EEOC. (R. 10-3, Aguirre Am. Compl. ¶ 3.) On September 29, 2000, the EEOC issued a right to sue letter, which Aguirre received on October 3, 2000. (*Id.*) On December 21, 2000, Aguirre filed a complaint with this Court.

## IV. Elizabeth Coy

### A. Background

In February 1998, Elizabeth Coy began her employment as a Marketing Associate with BDO. (R. 24-A, Def.'s Statement of Facts ¶¶ 1, 4.) Coy has a bachelor's degree in clinical psychology from Purdue University and expects to earn an M.B.A. from Indiana University in April 2002. (*Id.* at ¶¶ 5-6.) Before she began her employment with BDO, Coy had several years of experience in various occupations, including as a customer service representative, an information operator, an executive secretary and in marketing positions. (*Id.* at ¶¶ 7-8.) In her Marketing Associate position with BDO, Coy performed general secretarial tasks, coordinated the distribution of prepared marketing materials and coordinated, with other BDO personnel, the preparation of custom marketing materials. (*Id.* at ¶ 13.)

From October 19, 1998, until the last week of February 1999, Coy was on maternity leave from her Marketing Associate position with BDO. (*Id.* at ¶ 14.) Because of day care and scheduling issues, Coy eventually was offered and accepted a position as an Executive Assistant in the Human Resources department. In this position, she reported to Julie Harter, BDO's Executive Director of Human Resources, and Warren Holmes, BDO's Director of Partner Matters. (*Id.* at ¶¶ 16-22, 24.) In Coy's new position as a Senior Human Resources Specialist, she mainly performed secretarial work for Holmes and Harter. (*Id.* at ¶¶ 25-27.)

## B. Coy's Termination

In December 1999, BDO began a reorganization of its staffing in its executive and national offices. (R. 24-A, Def.'s Statement of Facts ¶ 29.) In April 2000, Bob Gaida, BDO's Vice Chairman, notified Holmes and Harter that their positions were being eliminated and that their employment would be terminated. (*Id.* at ¶ 30.) Holmes and Gaida decided that because Coy only worked for Holmes and Harter, Coy's position would likely be eliminated unless she could transfer to some other area of BDO. (*Id.* at ¶ 31.) Effective June 30, 2000, Coy, Harter and Holmes were all terminated from BDO. (*Id.* at ¶¶ 31-32.) Coy did not obtain another position within BDO. (*Id.* at ¶ 33.)

## C. Coy's Allegations of Discriminatory Intent

Coy takes issue with BDO's continued employment of the following Caucasian employees: Rieckmann, D'Agostin, Shari Steele, and Cindy Gillen. Coy asserts, and BDO denies, that these four employees were employed at the same Senior Associate level as Coy. (R. 35-3, Coy Add'l Facts ¶ 5; R. 44, Def.'s Resp. to Coy Add'l Facts ¶ 5.) As a result of the reorganization, Rieckmann and D'Agostin were transferred to recruiter and administrative assistant positions, respectively, in the Chicago practice office. (R. 24-A, Def.'s Statement of Facts ¶¶ 50, 54.) Steele was also moved to the Chicago practice office where she continued entry level professional recruiting. (*Id.* at ¶¶ 61, 62.) Also as a result of the reorganization, Gillen, who had eight years of travel management experience prior to BDO as well as experience managing BDO's travel programs, became BDO's Travel Coordinator (*Id.* at ¶ 65, 66, 70.)

On July 24, 2000, Coy filed a Charge of Discrimination with the EEOC. (R. 10-4, Coy Am. Compl. ¶ 3.) The EEOC issued a right to sue letter on September 29, 2000, which Coy received on October 3, 2000. (*Id.*) On December 21, 2000, Coy filed a complaint with this Court.

## LEGAL STANDARDS

A motion for summary judgment is granted when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Jordan v. Summers*, 205 F.3d 337, 342 (7th Cir. 2000). When ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the non-moving party and draw all inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998). The court, however, need not defeat a motion for summary judgment due to "the mere existence of *some* alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at 247, or the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In short, the court must decide "whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989). We must apply these standards with added care in employment discrimination cases, as intent is often a contested issue of material fact in these cases. *Wallace v. SMC Pneumatics, Inc.* 103 F.3d 1394, 1396 (7th Cir. 1997).

## ANALYSIS

### I. Robbin Johnson-Carter

Johnson-Carter alleges racial harassment and discriminatory treatment and termination. For the reasons set out herein, we reject these claims.

#### A. Johnson-Carter's Discriminatory Treatment Claims

Johnson-Carter alleges discriminatory treatment under Title VII and 42 U.S.C. § 1981.[7] Specifically, Johnson-Carter alleges that she was: (1) denied training opportunities given to non-African-Americans; (2) not invited to attend staff meetings that non-African-American counterparts attended; (3) required to work in assurance training, an area outside her expertise; and (4) denied compensatory time off and performance feedback.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Johnson-Carter can avoid summary judgment on her Title VII discrimination claims either by presenting direct evidence that BDO's actions were racially motivated or by employing the indirect burden-shifting method originally formulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Michas v. Health Cost Controls*, 209 F.3d 687, 693 (7th Cir. 2000). Because Johnson-Carter concedes that she has no direct evidence of discrimination, her discrimination claims must satisfy the burden-shifting analysis in order to survive summary judgment. Under *McDonnell Douglas* and its

---

[7] In analyzing Johnson-Carter's § 1981 claims, we employ the same framework used with respect to her Title VII claims. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999).

progeny, Johnson-Carter must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was meeting BDO's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated persons outside the protected class were treated more favorably. *Id.*

Once Johnson-Carter establishes her *prima facie* case, a rebuttable presumption of discrimination arises and the burden of production shifts to BDO to articulate a legitimate, nondiscriminatory reason for its action. *Id.* at 694. If BDO produces a legitimate, nondiscriminatory reason for its action, the presumption of discrimination dissolves and the burden of production shifts back to Johnson-Carter to show that the proffered reason is a pretext for discrimination. *Id.* In order to establish pretext, Johnson-Carter must show that BDO's reason is "unworthy of credence." *Logan v. Kautex Textron N. A.*, 259 F.3d 635, 640 (7th Cir. 2001).

BDO offers two arguments in support of its motion for summary judgment on the discriminatory treatment claims. First, BDO argues that Johnson-Carter cannot establish a *prima facie* case on any of her discrimination claims. Specifically, BDO argues that Johnson-Carter does not meet the second, third and fourth prongs of the *McDonnell Douglas* test. In other words, BDO argues that Johnson-Carter did not meet BDO's legitimate expectations, that the actions she complains of were not materially adverse and that similarly situated persons outside the protected class were not treated more favorably. Second, BDO argues that even if Johnson-Carter could make out a *prima facie* case on any of her discrimination claims, she could not raise an inference that BDO's reasons for its actions were pretext for intentional race discrimination. As detailed herein, we conclude that Johnson-Carter cannot establish a *prima facie* case or pretext on any of her discriminatory treatment claims.

## 1. Johnson-Carter Was Not Meeting BDO's Legitimate Expectations

First, we agree with BDO's contention that Johnson-Carter was not meeting its legitimate performance expectations. Johnson-Carter concedes that she received mixed and negative performance reviews from Mike Ross, Julie Harter and Rod Mebane during the summer and fall of 1999. She argues, however, that prior to Mebane's hire as head of the CPD in July 1999, she received a positive performance review and bonus and that Mebane manufactured the negative reviews.[8] (R. 36, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 2, 5-6.) This prior performance review is not in the record, however, and Johnson-Carter's assertion in her affidavit that its contents are positive is hearsay which is insufficient to support her claim. Fed.R.Evid. 801(c). *See also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("[A] party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment.") (citations omitted).

Even if Johnson-Carter received a positive performance evaluation prior to Mebane's arrival, this fact is irrelevant because it is Plaintiff's performance at the time of the alleged discrimination which is critical. *See Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."). Furthermore, Johnson-Carter's positive evaluation came under a prior supervisor. *Id.* ("nor can such

---

[8] Johnson-Carter argues that her case is similar to *Johnson v. Zema Systems*, 170 F.3d 734 (7th Cir. 1999). In *Zema Systems*, plaintiff showed that he had met his employer's legitimate performance expectations by coming forward with consistently positive employment evaluations and a recommendation from the president of the company. *Id.* at 743. Johnson-Carter does not offer the same evidence. She only points to one positive evaluation, with her latter evaluations evidencing unsatisfactory performance. (*See* R. 36-3, Johnson-Carter Add'l Facts ¶ 2; R. 20, Def.'s Statement of Facts ¶¶ 22-26, 33-35, 38, 46-56.)

evaluations, standing alone, create a genuine issue of triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.") Johnson-Carter cannot point to this lone positive evaluation given by a prior supervisor as evidence that she was meeting BDO's legitimate performance expectations at the time of the alleged discriminatory treatment and termination. In addition, Johnson-Carter cannot point to the bonus she received at an unspecified time prior to Mebane's hire as evidence that she was meeting BDO's legitimate expectations at the time of the alleged discrimination and her termination. *See Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 452-453 (7th Cir. 1998) ("[P]ast raises and bonuses do not prove that . . . [plaintiff] was meeting . . . [defendant's] legitimate expectations *at the time of . . . [her] discharge*.").

Both parties also point to Johnson-Carter's self-evaluation in July 1999 as evidence supporting their view of Plaintiff's performance. Johnson-Carter admits that she rated herself as "needs improvement" or "unsatisfactory" in ten categories, but also adds that she rated herself as "above average" in other categories. (R. 20, Def.'s Statement of Facts ¶ 41; R. 36-3, Johnson-Carter Add'l Facts ¶ 4.) The positive aspects of Johnson-Carter's subjective self-evaluation cannot, however, create a genuine issue of material fact as to whether she was meeting BDO's legitimate performance expectations. *Fortier*, 161 F.3d at 1114. Even though Johnson-Carter might have accurately rated her strengths as an employee, Mebane – as her direct supervisor – had the discretion to acknowledge these strengths while still finding her performance lacking. *Id.*

Finally, Johnson-Carter argues that she was meeting BDO's legitimate expectations because at the time of her termination, Mebane told her that her termination had nothing to do with her performance. (R. 36-1, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.)

BDO admits that Mebane told Johnson-Carter that her termination was not performance related. (R. 40, Def.'s Resp. to Johnson-Carter Add'l Facts ¶ 9.) Given the record of Johnson-Carter's performance, Mebane's comment does not persuade us that Johnson-Carter was in fact meeting BDO's expectations at the time of her termination. (R. 20, Def.'s Statement of Facts ¶¶ 22-26, 33-35, 38, 46-56.) The Seventh Circuit has noted that despite employee performance problems, an employer might provide an employee with a benign reason for her dismissal in order not to hamper a future job search and might not fully explain the reasons for a termination until a suit is filed. *Witmmer v. Maclean Hunter Publ'g Co.*, No. 95-1699, 73 F.3d 365, 1995 WL 767091, at *7-8 (7th Cir. Dec. 27, 1995). At the time of Johnson-Carter's termination, BDO was in fact reorganizing its structure and Mebane likely did not want to add that BDO had also been less than pleased with her performance.

In short, Johnson-Carter has not come forward with evidence that she was meeting BDO's legitimate expectations. She admits that BDO believed that her performance was lacking during the summer and fall of 1999, and the evaluations by Ross, Harter and Mebane also show that she was not meeting performance expectations. As such, Johnson-Carter cannot establish the second prong of her *prima facie* case.

## 2. Johnson-Carter's Allegations of Discriminatory Treatment Do Not Constitute Material Adverse Actions

Johnson-Carter also fails to prove that the actions she complains of – denial of training, non-invitation to staff meetings, requirement to work outside her area of expertise, denial of compensatory time off and lack of performance feedback – constitute material adverse employment actions. Adverse actions must be more than a "mere inconvenience or an alteration of job responsibilities." *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001) (citing

*Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7ᵗʰ Cir. 1993)). A "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest*, 240 F.3d at 612-613. However, "not everything that makes an employee unhappy is an actionable adverse action." *Id.* at 613 (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7ᵗʰ Cir. 1996)).

Two of Johnson-Carter's allegations clearly do not constitute material adverse actions. Johnson-Carter alleges that in taking over management of the assurance training program she was required to work outside her area of expertise. Johnson-Carter was still performing the same type of work, designing training materials, but on a different subject matter. We view the change of subject matter as an alteration of job responsibilities which does not rise to the level of an adverse employment action. The single denial of compensatory time off also does not constitute an adverse employment action. *See Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 972-73 (7ᵗʰ Cir. 2001) ("[T]he denial of a monetary perk . . . does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary.").

With regard to the remainder of Johnson-Carter's discriminatory treatment claims, the Seventh Circuit has given the district courts leeway in determining what constitutes a material adverse action, noting that "other indices that might be unique to a particular situation" might point to a material adverse action. *Oest*, 240 F.3d at 612-613. Although we believe a significant pattern of denial of training and performance feedback and non-invitation to meetings can

constitute adverse employment actions, in Johnson-Carter's case they do not. First, Johnson-Carter's denial of training claim is predicated on the fact that Mebane did not approve her request to attend a December 1999 leadership development seminar. (R. 10-1, Johnson-Carter Am. Compl. ¶ 10A; R. 20, Def.'s Statement of Facts ¶¶ 111-113.) This single denial did not materially affect Johnson-Carter's employment. She already had training in leadership development which Mebane knew when she put in the request. (R. 20, Def.'s Statement of Facts ¶ 112.) Second, Johnson-Carter's allegation that she was denied performance feedback fails given the performance evaluations in the record. (R. 20, Def.'s Statement of Facts ¶¶ 23-26, 33-35, 38, 46-58.) Third, there is no evidence that Johnson-Carter had reason to participate in the meetings that she alleges she was not invited to attend. Without more, we cannot find that Johnson-Carter's non-invitation to the three meetings materially and adversely affected her employment. In short, Johnson-Carter cannot establish the third prong of her *prima facie* case on any of her discriminatory treatment claims.

### 3. Similarly Situated Employees Were Not Treated More Favorably

Finally, Johnson-Carter cannot show that similarly situated non-African-Americans were treated more favorably. First, Johnson-Carter argues that she was required to work in an area outside of her expertise unlike fellow instructional designers Farias and Steele. It is true that both Farias and Steele worked in areas in which they had experience. The three instructional designers, however, were not comparable. Because Farias had tax experience and Steele had experience working with BTS, the two were needed to continue working on those training programs. When Mayberry, the previous assurance training manager, left the CPD, it made sense to replace him with Johnson-Carter because she had no tax experience and little BTS experience, and thus could

not have easily transitioned into Farias or Steele's positions had either been reassigned to assurance training instead. Given their different skill sets, we cannot conclude that Farias and Steele were treated more favorably than Johnson-Carter. Second, Johnson-Carter has not come forward with evidence of similarly situated non-African-Americans who were treated more favorably with regard to compensatory time off. She fails in meeting the fourth prong of her *prima facie* case with respect to this claim.

Third, with respect to the denial of training claim, Johnson-Carter compares herself to Farias and Steele who were each allowed to attend outside training on one occasion. BDO argues that Johnson-Carter was not similarly situated to Farias and Steele because she already had expertise in the training subject matter, and because she requested the training at a time when her work was potentially going to be outsourced. There is no evidence in the record that distinguishes Farias and Steele from Johnson-Carter with respect to the training claim (i.e. evidence that they had no prior knowledge of their outside seminar material or requested training before the reorganization). Although it is unclear whether Farias and Steele were similarly situated to Johnson-Carter with respect to the training claim, it is clear that Johnson-Carter still does not meet her *prima facie* case because the one-time denial of outside training on a subject already familiar to her is not a material adverse employment action. Finally, because we have already determined that Johnson-Carter's final two discriminatory treatment claims – lack of performance feedback and non-invitation to meetings – are either contradicted or unsupported by the record, we will not discuss whether Johnson-Carter meets the fourth prong of her *prima facie* case with respect to these two claims.

### 4. Pretext

Even assuming Johnson-Carter established a *prima facie* case on any of her discriminatory treatment claims, which she did not, she has not come forth with evidence showing that BDO's reasons for its allegedly discriminatory treatment are or were: (1) factually baseless; (2) not the actual motivation for the actions in question; or (3) insufficient to motivate the actions. *Logan*, 259 F.3d at 640. (*See* R. 36-1, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J.) Therefore, summary judgment is proper on Johnson-Carter's discriminatory treatment claims because she has not established a *prima facie* case or pretext on any of her claims.

### B. Johnson-Carter's Termination Claim

Finally, Johnson-Carter argues that she was terminated because of her race. Because she concedes that she has no direct evidence of discrimination, she must prove her case under the *McDonnell-Douglas* burden-shifting method. In support of its motion for summary judgment, BDO argues that Johnson-Carter cannot establish a *prima facie* case. More specifically, BDO maintains that Johnson-Carter did not meet legitimate expectations and that she was treated less favorably than similarly situated non-African-American employees. BDO further argues that even if Johnson-Carter could establish a *prima facie* case, she has not provided evidence that BDO's reason for the termination was pretext for discrimination. We agree with Defendant that Johnson-Carter cannot establish a *prima facie* case of discrimination or pretext and, therefore, we grant BDO's motion for summary judgment on the termination claim.

### 1. Johnson-Carter Cannot Show That She Was Meeting BDO's Legitimate Expectations or That Similarly Situated Employees Were Treated More Favorably

We have already concluded that Johnson-Carter was not meeting BDO's legitimate

performance expectations during the late fall of 1999 – the time of BDO's reorganization and the

decision to terminate her employment. Furthermore, Johnson-Carter cannot show that similarly

situated non-African-Americans were treated more favorably during the reorganization. Although

Johnson-Carter does not dispute that numerous non-African-Americans were also terminated

during the reorganization, she argues that Carol Steele, a Caucasian instructional designer, was

similarly situated and treated more favorably. Steele was transferred to BTS, a spin-off company.

BDO in turn argues that Johnson-Carter cannot compare herself to Steele because they were not

similarly situated as to experience and qualifications. We agree with BDO that Johnson-Carter

was not similarly situated to Steele and thus cannot argue that Steele was treated more favorably.

Johnson-Carter, therefore, fails to meet the fourth prong of her *prima facie* case on her

termination claim.

In deciding whether Johnson-Carter and Steele were similarly situated, we must look at all

relevant factors, the number of which depends on the context of the case. *Radue v. Kimberly-*

*Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Spath v. Hayes Wheels Int'l-In., Inc.*, 211

F.3d 392, 397 (7th Cir. 2000)). In reduction in force cases where some employees are terminated

while others are transferred, the terminated employee "need not show complete identity in

comparing himself to the better treated employee, but he must show substantial similarity." *Id.* at

618 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).[9]

Johnson-Carter lacks similarity to Steele in two respects: (1) work experience; and (2) job

performance at BDO. Steele had substantial experience working with BTS as project manager of

its training programs. Johnson-Carter, whose main work was in management development and

assurance training, only assisted Steele with BTS work on a few occasions. In addition, there is

no evidence that Steele had performance problems, whereas the record shows that Johnson-Carter

had performance problems. These two differences account for why Steele was treated more

favorably than Johnson-Carter in the reorganization. Johnson-Carter cannot meet the fourth prong

of her *prima facie* case on her termination claim.

### 2. Pretext

Summary judgment is further required on Johnson-Carter's termination claim because

BDO has proffered a legitimate reason for her termination, and Johnson-Carter has not

demonstrated that the reason is pretextual. BDO stands by its claim that Johnson-Carter's

position was eliminated when the company decided to outsource its instructional design work.

---

[9] Johnson-Carter again cites *Zema Systems* for the proposition that employees do not have to be similar in every respect in order to be comparators in fourth prong analysis. (R. 36-1, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5-6.) We agree that a plaintiff only needs to show substantial similarity to a non-protected class employee. *See Radue*, 219 F.3d at 618. *Zema Systems*, however, involved a particular factual scenario which is easily distinguished from the one at hand. In that case, because plaintiff was the only vice president of sales and marketing, defendant-employer argued that there were no similarly situated employees to conduct a fourth prong analysis. The Seventh Circuit ruled that plaintiff's singular job title should not preclude fourth prong analysis and that plaintiff's treatment should be compared with others in intermediate managerial positions. Here, the presence of comparators is not an issue. There is another instructional designer – Carol Steele – to whom Johnson-Carter can be compared. Thus, Johnson-Carter's reliance on *Zema Systems* fails.

(R. 19, Def.'s Mem. in Supp. of Mot. for Summ. J. at 6-7; R. 38, Def's Reply in Supp. of Mot. for Summ. J. at 5.)   Johnson-Carter does not dispute that the outsourcing actually occurred, but argues that this reason is pretext because she was the only instructional designer forced to work outside her area of expertise, Mebane ignored her and excluded her from meetings and the only other employees removed from her department on the day of her termination were either African-American or Hispanic.  (R. 36-1, Johnson-Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 6-7.)  As to Johnson-Carter's first two arguments, we have already concluded that there were legitimate reasons why Johnson-Carter, and not Farias or Steele, was required to work in assurance training and Johnson-Carter's claim of being excluded from meetings is too vague given that there is no record evidence that she should have been present at those meetings.

Moreover, Johnson-Carter's assertion that only Hispanic and African-American women from her department – Aguirre, Montez and Guttierez – were discharged on the date of her termination does not contradict the fact that Johnson-Carter was terminated because her work was outsourced during the reorganization.  In addition, the record does not show that all four women worked in the same department.  From the record it is clear that Montez worked in the CPD, (R. 40, Def.'s Resp. to Pl.'s Add'l Facts ¶ 8.), Aguirre worked in Human Resources, (R. 21, App. in Supp. of Def.'s Mot. for Summ. J., Tab D, Forgue Aff.), and it is unclear in which department Guttierez worked (*id.*).  Besides being "minorities," all three women worked in support staff positions, usually the first to be cut during a reorganization.  Johnson-Carter cannot show that BDO's reason for terminating her is pretext simply by pointing out that another African-American and two Hispanics were terminated on the same day.  This fact does not contradict the reality of BDO's reorganization.  Johnson-Carter's work was outsourced in the reorganization – a legitimate, nondiscriminatory reason for terminating her.

In short, BDO has proffered a legitimate reason – reorganization and outsourcing of instructional design work – for terminating Johnson-Carter's employment, and she has failed to show that this reason is unworthy of belief. Therefore, summary judgment is warranted on Johnson-Carter's termination claim because she cannot establish a *prima facie* case or pretext.

## C. Johnson-Carter's Harassment Claims

Finally, we also reject Johnson-Carter's harassment claims – i.e. that she was subject to verbal attacks and offensive comments by BDO employees. (R. 10-1, Johnson-Carter Am. Compl. ¶¶ 10(B) and (D).) Johnson-Carter does not characterize these claims as either direct evidence that BDO's actions were racially motivated or as evidence of a racially hostile work environment.

First, the instances of harassment offered by Johnson-Carter, however unpleasant or inappropriate, do not constitute direct evidence of a discriminatory termination in violation of Title VII. Statements offered as direct evidence of discrimination are relevant only if they are both made by a decisionmaker and related to the employment decision at hand. *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998). Two of the alleged harrassers, Huddleston and Nieman, were co-workers whose comments were unrelated to Johnson-Carter's termination. Harter, although a superior, was not involved in the decision to terminate Johnson-Carter and her comment about Johnson-Carter's neighborhood was unrelated to Johnson-Carter's discriminatory termination.

Second, Johnson-Carter's allegations of harassment do not meet the standard for showing a racially hostile work environment under Title VII. A plaintiff claiming a hostile work environment must show that she subjectively perceived the environment to be hostile and that a reasonable person would also objectively perceive the environment to be hostile. *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).  To determine whether a work environment is

objectively hostile, we must look at a variety of factors, including "the frequency of

discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting *Harris*,

510 U.S. at 23).

In this case, the alleged harassment, however inappropriate, was neither frequent nor

severe.  Johnson-Carter alleges only a few instances of harassment: (1) the yelling by Huddleston;

(2) the hair comment by Nieman; and (3) the neighborhood comment by Harter.  Only the latter

two comments are linked to race, and even so, isolated comments are not legally

sufficient to sustain a hostile work environment claim.  *Adusumilli*, 174 F.3d at 361-362.  The

Seventh Circuit recently reiterated the Supreme Court's cautionary words that "simple teasing,

offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.' " *Id.* at 361 (citing *Faragher

v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted)).  As such, Johnson-Carter's

harassment claims are legally insufficient to constitute direct evidence of discrimination or

evidence of a hostile working environment.

## II. Sandra E. Carter

Carter alleges discriminatory treatment, a racially hostile working environment, and

constructive discharge.  For the reasons set out herein, we reject these claims.[10]

---

[10] In her Amended Complaint, Carter also alleges a racially hostile working environment. (R. 10-2, Carter Am. Compl. ¶¶ 11, 16.)  BDO argues that Carter abandoned this claim in her deposition because she admitted that she never heard anyone at BDO use racial slurs or make racial comments.  (R. 26-2, Def.'s Mem. in Supp. of Mot. for Summ. J. at 3.)  Carter does not

## A. Carter's Discriminatory Treatment Claims

Carter alleges several types of discriminatory treatment which we will analyze under the

*McDonnell Douglas* burden-shifting method. Specifically, Carter alleges that she was: (1)

reclassified from an executive assistant position to a clerical position, (R. 10-2, Carter Am.

Compl. ¶ 11A); (2) required to do personal business for various executives, (*id.* at ¶ 11B); (3) told

not to talk to anyone outside her department, (*id.* at ¶ 11C); (4) monitored when arriving at and

leaving her desk, (*id.* at ¶ 11D; R. 27, Def.'s Statement of Facts ¶¶ 54, 55); (5) ignored by her

bosses, (R. 10-2, Carter Am. Compl. ¶ 11E); (6) required to stay late, (*id.* at. ¶ 11F); and (7)

required to affirmatively commit to the reclassified job, (*id.* at ¶ 11G).

BDO offers two arguments in support of its motion for summary judgment on Carter's

discriminatory treatment claims. First, BDO argues that Carter cannot establish a *prima facie* case

on any of her claims because none of the actions were materially adverse, and that Carter cannot

show that similarly situated non-African-Americans were treated more favorably. Second, BDO

argues that even if Carter could establish a *prima facie* case on any of her discrimination claims,

she could not raise an inference that BDO's reasons for its actions were pretext for intentional

race discrimination. We conclude that Carter cannot establish a *prima facie* case or pretext on any

of her discriminatory treatment claims.

### 1. Carter's Allegations of Discriminatory Treatment Do Not Constitute Material Adverse Actions

We agree with BDO's contention that the actions Carter complains of do not constitute

material adverse actions. First, Carter's claim that she was required to do personal work for

---

discuss this claim in her response to BDO's motion for summary judgment. Assuming that
Carter's hostile work environment claim still stands, it fails because the conduct she complains
of is not severe, pervasive or discriminatory in nature.

supervisor O'Neill does not rise to the level of an adverse employment action. Performing a few tasks for a supervisor is a "mere inconvenience" rather than an adverse action. *Oest*, 240 F.3d at 612 (citation omitted). Second, Carter's claim that she was told to limit discussion of work-related problems to either O'Neill, Grimmer or the Human Resources Manager also fails because Carter did not show how this request had a material effect on her employment. (*See* R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 3-6.) Third, Carter's allegation that her employment was adversely affected because her supervisors ignored her also does not constitute a material adverse action. The claim is vague and not fleshed out in the record and is contradicted by Carter's other claims, such as the claim that her whereabouts were monitored.[11] (*Id.* at 4-6.)

Several of Carter's claims are incidents of employment in most administrative/secretarial positions, not adverse employment actions. From this Court's experience, it is commonplace that an executive assistant inform her supervisor when she is unavailable, stay past 5:00 p.m. to finish projects that need to be sent out promptly and check-in with her supervisor before the end of the day to confirm that no more work needs to be done. Carter has failed to show how Grimmer and O'Neill's requirements and actions materially and adversely affected her employment. *But see Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

The final claims in Carter's Amended Complaint involve the reclassification of Carter's position and Grimmer's requirement that she affirmatively commit to the position as newly described. (R. 10-2, Carter Am. Compl. ¶¶ 11A, 11G.) Although Carter was hired as an executive assistant, her job title was changed to "administrative assistant/clerk" in March 2000.

---

[11]Although Carter did not reiterate these claims from her Amended Complaint in her Memorandum in Opposition to Defendant's Motion for Summary Judgment, and BDO argues that the claims have been abandoned, we briefly address and reject the claims here.

During this time, Carter also received a job description for the newly-defined position. The parties agree that Carter's salary and benefits were not changed by the job description, but disagree as to whether Carter's duties were substantially changed. Carter alleges that the job description contained a second page of additional responsibilities. (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.) In her deposition, Carter specified the additional responsibilities: (1) refiling documents according to O'Neill's system; (2) checking Grimmer and O'Neill's outboxes every few hours; (3) following-up on assignments; (4) maintaining a correspondence file for Grimmer; and (5) maintaining Grimmer's periodical file. (R. 28, App. in Supp. of Def.'s Mot. for Summ. J., Tab A, Carter Dep. at 225-227.) BDO maintains that the duties listed on the job description were substantially the same as Carter's existing job duties. (R. 27, Def.'s Statement of Facts ¶ 69.)

For a change in a job title to constitute a material adverse action, it must be accompanied by a diminishing of significant responsibilities. *Crady*, 993 F.2d at 135-136. In *Crady*, the Seventh Circuit held that a change in position from an assistant vice president at one bank branch to a loan officer position at another branch did not constitute a material adverse action because plaintiff maintained the same level position, salary and benefits and did not show that his changed responsibilities were any less significant. *Id. See also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994) (changes in title and supervisor are "largely semantic where the employee's salary, benefits, and level of responsibility would remain unchanged"). In this case, the change in Carter's job title -- from executive assistant to administrative assistant/clerk -- was even less dramatic than in *Crady*. In addition, the parties agree that Carter's salary and benefits remained unchanged. Finally, although Carter's responsibilities changed, they were not less significant than her prior responsibilities. The additional duties were mainly filing requirements,

for which Carter had been responsible since her hire. In short, Carter's change in title and duties did not significantly alter her employment and did not constitute a material adverse employment action.

Carter also claims that Grimmer's requirement on March 27, 2000 that Carter affirmatively commit to the newly-described position constituted a material adverse action. BDO argues that given Carter's expressed concerns about her daily departure time and the new filing requirements, it was not unreasonable to request an affirmative commitment. This Court, like Carter, believes that Grimmer's ultimatum – "I want you to say that you want the job and quit playing with words" – was unduly forceful, but the requirement still does not rise to the level of a material adverse action. (R. 27, Def.'s Statement of Facts ¶ 88 (citing Carter Dep. at 212).)

Finally, in response to BDO's motion, Carter alleges that O'Neill yelled at Carter, on one occasion in front of co-workers. (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4-5.) This Court agrees with Carter that O'Neill's treatment indicates a lack of professionalism, but Carter fails to show how it materially and adversely affected her employment with BDO. *See* *Oest*, 240 F.3d at 613 (citing *Smart*, 89 F.3d at 441) ("Not everything that makes an employee unhappy is an actionable adverse action.").

## 2. Similarly Situated Employees Were Not Treated More Favorably

In addition to failing to allege any material adverse actions, Carter also fails to show that similarly situated non-African-American employees were treated more favorably. Carter, citing her deposition testimony, argues that "other executive assistants" were treated more favorably and relies upon *Zema Systems* to argue that she can compare her treatment to these workers outside

her department with different supervisors.[12] (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 7-8.) BDO argues that Carter's comparison to these other employees is irrelevant because they lacked a common supervisor. (R. 26-2, Def.'s Mem. in Supp. of Summ. J. at 8-9 (citing *Radue*, 219 F.3d at 618 ( lack of a common supervisor "alone probably precludes a showing of similarity because when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects")).)

In *Zema Systems*, the Seventh Circuit held that the fact that plaintiff was the only employee in his position did not preclude a similarly situated analysis; plaintiff could compare himself to others at the same intermediate managerial level. *Johnson*, 170 F.3d at 743-744. Carter's situation is analogous to the plaintiff in *Zema Systems* in that she was the only executive assistant in the legal department. BDO would be insulated from claims of racial discrimination if Carter could not compare herself to executive assistants outside the legal department. Even though Carter's situation is analogous to the one in *Zema Systems*, Carter's allegations are too vague to conduct a similarly situated analysis. Carter argues, without specific names and based only on her observations, that these other employees were not monitored or under the same scrutiny.[13] (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8.) In short, Carter

---

[12] In her deposition, Carter compares herself to Theresa (surname unidentified), Jody Gula, Virginia Wise, Sillisa Humphrey, Michelle Srebalis, Johns Sprenger, Brenda Huddleston, Nancy (surname unidentified) and Robbin Johnson-Carter. (R. 29, App. in Supp. of Def.'s Motion for Summ. J., Tab A, Carter Dep. at 88-89, 188-189).

[13] In addition, two of the nine employees cited by Carter – Sillisa Humphrey and Robbin Johnson-Carter – are also African-American. Thus, they cannot be used as comparators in a fourth prong similarly situated analysis as comparators must be outside the plaintiff's protected class.

fails to establish the fourth prong of her *prima facie* case because she fails to show that similarly situated non-African-Americans were treated more favorably.

### 3. Pretext

In addition to failing to establish a *prima facie* case, Carter also cannot show that BDO's proffered reasons for its actions were pretext for intentional discrimination. BDO argues that a number of the actions Carter complains of – such as limiting discussion of work-related problems to the proper persons, checking in when arriving or leaving, apprising one's supervisor of one's whereabouts and being required to stay past normal working hours – are incidents of employment in general or of employment in a secretarial position. (R. 26-2, Mem. in Supp. of Def.'s Mot. for Summ. J. at 9-10.) BDO also argues that Carter was required to do personal work for O'Neill simply because O'Neill needed it done, (*id.* at 9), that Carter's job was reclassified with a new job description because Grimmer and O'Neill were having difficulty getting Carter to perform more menial tasks, (R. 43, Def.'s Reply at 6), and that Carter was asked to affirmatively commit to the job because Grimmer and O'Neill wanted to be sure that Carter was aware of, and committed to, performing her duties, (R. 26-2, Def.'s Mem. in Supp. of Mot. for Summ. J. at 10). Carter responds to these proffered reasons by pointing out that "none of the other executive assistants were 'reclassified' as Carter . . . [or] under the same scrutiny as Carter." (R. 27-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ .J. at 9.) Carter is attempting to show pretext by comparing herself to similarly situated non-African-American employees. *See Essex v. United Parcel Service*, 111 F.3d 1304, 1311(7th Cir. 1997) ("A plaintiff may establish pretext by offering evidence that other similarly situated employees were treated more favorably") (citation omitted). We have already concluded, however, that Carter's comparisons to other employees are too vague to conduct a similarly situated analysis. In addition to failing to establish a *prima facie* case on

her discriminatory treatment claims, Carter also fails to establish that BDO's proffered reasons for its actions are pretext.[14]

## B. Carter's Constructive Discharge Claim

Carter argues that she was forced to resign from her position at BDO because she was subject to Grimmer and O'Neill's yelling, scrutiny, "monitoring" and "reclassification" of her job. (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 9-10.) BDO argues that these allegations do not support a claim of constructive discharge. (R. 26-2, Def.'s Mem. in Supp. of Summ. J. at 10-12.) We agree. " '[T]o state a claim for constructive discharge, a plaintiff needs to show that her working conditions were so intolerable that a reasonable person would have been compelled to resign." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001) (quoting *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994) (citations omitted)). In addition, the conditions "must be intolerable because of unlawful discrimination." *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). The Seventh Circuit has found intolerable working conditions in extreme situations. *See, e.g. Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (manager photographed an African-American employee while he held a gun to the employee's head and then circulated the picture at work, stating "this is what a n----- looks like with a gun to his head"); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989) (African-American female employee was subject to a series of offensive racial and

---

[14] Carter also argues that BDO's reasons for its actions were pretext for discrimination because Kevin Roberts told her that she was being set up to be fired or let go. (R. 37-1, Carter Mem. in Opp'n to Def.'s Mot. for Summ. J. at 9 (citing Carter Dep. at 215-216).) The record does not indicate the basis of Roberts' statement, which could be rumor or Roberts' own opinion. (*Id.*) The record does show, however, that Grimmer and O'Neill wanted someone who could work overtime and commit to performing all the job tasks, which Carter was hesitant to do. (*See* R. 27, Def.'s Statement of Facts ¶¶ 22, 56, 68, 73-75, 79.) Roberts' comment does not raise an inference of race discrimination.

sexual comments culminating in a physical threat while being shown a racist, pornographic photograph).

The conditions that Carter complains of do not rise to the level that the Seventh Circuit considers intolerable, nor were they racially-motivated. The yelling, scrutiny, and "reclassification," however unpleasant, fall in line with conditions that the Seventh Circuit deems tolerable. *See e.g. Harriston v. Chicago Tribune Company*, 992 F.2d 697, 705 (7th Cir. 1993) (employer reprimanding plaintiff-employee for no reason is a tolerable working condition); *Nordstrom*, 260 F.3d at 735 (supervisors monitoring and giving a disproportionate amount of "menial" work to plaintiff-employee are tolerable working conditions). Therefore, the conditions that Carter complains of do not rise to the level necessary to sustain a constructive discharge claim.

## III. Kendra Aguirre

### A. Aguirre's Termination Claim

Aguirre argues that BDO terminated her employment because she is African-American. BDO maintains, however, that it did not terminate Aguirre because of her race, but that her position was eliminated in BDO's reorganization process. (See R. 23-2B, Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J.) Because BDO does not dispute that the first three elements of Aguirre's *prima facie* case are met, we will only address whether Aguirre established the fourth prong of her *prima facie* case.

### 1. Similarly Situated Employees Were Not Treated More Favorably

Aguirre alleges that D'Agostin, Wise, and Rieckmann – all Caucasian employees – were similarly situated and treated more favorably. Specifically, Aguirre claims that Wise and

40

D'Agostin "were considered for termination because they did not have enough work to do, but they were kept on." (R. 32, Aguirre Mem. in Opp'n to Def.'s Mot. for Summ. J. at 3.)

With respect to Wise, there is insufficient information in the record to determine whether she was similarly situated to Aguirre. Aguirre briefly mentions Wise as an employee who was not terminated. (*Id.*) Because no information is provided as to Wise's experience, education or qualifications, the Court is unable to conclude whether she was similarly situated to Aguirre.

It is clear, however, that Aguirre was not similarly situated to Rieckmann because Aguirre lacked Rieckmann's qualifications and experience. As part of the reorganization process, BDO decided that its objective to recruit experienced candidates could best be accomplished by creating a National Director of Experienced Recruiting within the National Recruiting Group, along with various recruiter positions in selected practice offices. (R. 24-B, Def.'s Statement of Facts ¶ 37.) Rieckmann, who had nine years of recruiting experience before working at BDO and who was part of the National Recruiting Group, accepted an offer for an experienced recruiting position in BDO's Chicago practice office. (*Id.* at ¶¶ 38, 40.)

Aguirre did not possess experience or qualifications comparable to Rieckmann. In particular, Aguirre was not part of the National Recruiting Group, and she performed human resources generalist responsibilities such as new hire orientations and payroll duties. (R. 24-B, Def.'s Statement of Facts ¶ 23.) In contrast, Rieckmann's responsibilities were more specialized and substantive. While working with the National Recruiting Group, Rieckmann was responsible for duties such as establishing recruiting procedures and policies for BTS and organizing BDO's Internet recruitment efforts. (*Id.* at ¶ 41.) In her new position at the Chicago practice office, Rieckmann recruited professionals for the Chicago and other Midwest offices, and continued to

organize BDO's Internet recruitment efforts. (*Id.* at ¶ 43.) In short, Rieckmann and Aguirre were not similarly situated with respect to experience and qualifications.

Aguirre also was not similarly situated to D'Agostin because the two did not share analogous attributes or experience. Before the reorganization, D'Agostin worked in the National Recruiting Group where she performed administrative work for Rieckmann and other members of the Group. (*Id.* at ¶ 46.) During the reorganization, D'Agostin was offered and accepted a position as an Administrative Assistant in BDO's Chicago practice office where she continued working as Rieckmann's administrative assistant. (*Id.* at ¶ 48.) Thus, D'Agostin, unlike Aguirre, had an ongoing working relationship with Rieckmann before the reorganization process.

Another factor that distinguished Aguirre from Rieckmann and D'Agostin was that the supervisors who determined that Aguirre's position could be eliminated were not involved in the decision to retain Rieckmann and D'Agostin. *See Radue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.") (citations omitted). In particular, Mooney and McLaughlin determined that Aguirre's position could be eliminated. (R. 24-B, Def.'s Statement of Facts ¶ 31.) Harter and Vitoski, however, were responsible for retaining both D'Agostin and Rieckmann. (*Id.* at ¶¶ 37-38, 47.) Hence, the same supervisor was not responsible for the employment decisions that affected Aguirre, Rieckmann and D'Agostin. Therefore, we conclude that Aguirre was not similarly situated to Rieckmann or D'Agostin and she fails to establish the fourth prong of her *prima facie* case.

## 2. Pretext

Although Aguirre fails to establish a *prima facie* case of racial discrimination, we nevertheless address the issue of pretext. BDO asserts that Aguirre was terminated as a result of BDO's reorganization. According to Aguirre, BDO's assertion is pretextual because similarly situated coworkers were transferred and not terminated. Because Aguirre fails to show that D'Agostin and Rieckmann were similarly situated, however, she also fails to raise an inference of pretext by showing that D'Agostin and Rieckmann were treated more favorably. *See Essex,* 111 F.3d at 1311.

Aguirre also argues that her position could not have been eliminated because she performed basic human resources work that was necessary to running an office. (R. 32, Aguirre Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4.) Aguirre's argument regarding the impossibility of eliminating her position does not cast enough doubt upon the legitimacy of BDO's explanation for terminating her. BDO management determined that Aguirre's position could be eliminated because some of her duties had been eliminated and her remaining duties could be assumed by others in the restructured organization. (R. 24-B, Def.'s Statement of Facts ¶ 31.) Courts do "not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chi. Trib. Co.,* 797 F.2d 458, 464 (7th Cir. 1986) (citation omitted). Hence, this Court finds that Aguirre has not made a sufficient showing that BDO's proffered reason for terminating her is pretextual.[15]

---

[15] As evidence of pretext, Aguirre also alleges that Roberts told her that her termination was unfair, and that Wise and D'Agostin had also been considered for termination but had been retained. (R. 32, Aguirre Mem. In Opp'n to Def.'s Mot. For Summ. J. at 4-5.) The record shows that BDO's Chief of Staff, Mooney, decided that Aguirre's position should be eliminated as part of the reorganization process. (R. 24-B, Def.'s Statement of Facts ¶¶ 27-31.) The record does not show that Roberts was involved in the decision to terminate Aguirre (*See* R. 24-B Def.'s

## IV. Elizabeth Coy

### A. Coy's Termination Claim

In support of its motion for summary judgment, BDO argues that it terminated Coy, not because of her national origin, but because her position was eliminated in BDO's reorganization process. (*See* R. 23-2A, Def.'s Mem. in Supp. of Mot. for Summ. J.) BDO does not dispute that Coy meets the first three prongs of the *McDonnell Douglas* test. Therefore, the only issues in dispute are whether Coy satisfies the fourth prong of her *prima facie* case and whether she can establish that BDO's reason for her termination was pretext.

#### 1. Similarly Situated Non-Hispanics Were Not Treated More Favorably

To meet the fourth prong of the *McDonnell Douglas* test, Coy must identify similarly situated non-Hispanic employees who were treated more favorably in the reorganization process. Coy argues that she was similarly situated to and treated less favorably than Rieckmann, D'Agostin, Shari Steele and Cindy Gillen – all Caucasian employees. Coy alleges that she was similarly situated to the four employees because they were all employed at the Senior Associate level before BDO's reorganization process. (R. 35-3, Coy Add'l Facts ¶¶ 4-5.) BDO argues that Coy's assertion that all five were at the same level is unsupported by the record. (R. 44, Def.'s Resp. to Coy Add'l Facts ¶ 5.) We find that even if Coy had provided support in the record for her assertions, she still would not be similarly situated to Rieckmann, D'Agostin, Steele or Gillen.

First, with respect to Rieckmann, Coy is not similarly situated because Coy lacks Rieckmann's experience and qualifications. As a result of BDO's reorganization process,

---

Statement of Facts; R. 33-2, Pl.'s Statement of Facts.) Roberts opinion and feelings about the personnel decision are irrelevant and do not establish that BDO's reason for terminating Aguirre – reorganization – was pretext for discrimination.

Rieckmann accepted an experienced recruiting position in BDO's Chicago practice office. (R. 24-A, Def.'s Statement of Facts ¶¶ 44-45, 50.) Even though Coy had approximately eleven years of work experience before she began her employment at BDO, her experience, in contrast to Rieckmann's, was varied and not focused in the human resources/recruiting area. Prior to her employment with BDO, Coy was a customer service representative for approximately five months, an information operator for over two years, an executive secretary for nearly three years, and in marketing positions for nearly four years. (*Id.* at ¶¶ 7-8.) Rieckmann had nine years of experience in the recruiting field before she worked at BDO. (*Id.* at ¶ 47.)

Rieckmann's responsibilities with the National Recruiting Group at BDO were also more specialized than Coy's responsibilities as a Senior Human Resources Specialist. In her Human Resources position, Coy performed mainly secretarial work – scheduling meetings, completing reports, monitoring the department budget, working on special projects and filling in at the reception desk. (*Id.* at ¶ 27.) In contrast, Rieckmann was responsible for establishing recruiting procedures and policies for BTS and organizing BDO's Internet recruitment efforts (*Id.* at ¶ 48.) In light of Rieckmann's extensive recruiting experience, Coy fails to show that she was similarly situated to Rieckmann.

Coy was also not similarly situated to Shari Steele because the two did not possess analogous qualifications. Like Rieckmann, Steele worked in the National Recruiting Group. In addition, Coy and Steele had differing job responsibilities. Whereas Coy performed mostly secretarial tasks before the reorganization, Steele was responsible for entry level professional recruiting. (*Id.* at ¶¶ 27, 58.) As a result of the reorganization, Steele accepted the position of National Entry Level Recruiting Manager in BDO's Chicago practice office. (*Id.* at ¶ 61.) In this new position, Steele continued to perform the same recruiting duties she performed prior to the

reorganization, along with recruiting at key colleges and universities. (*Id.*) Because Steele had recruiting experience at BDO and was a member of the National Recruiting Group, her qualifications were not analogous to Coy's. Therefore, Coy and Steele were not similarly situated with respect to the Recruiting Manager position Steele accepted during BDO's reorganization.

Coy and D'Agostin also were not similarly situated. As a result of the reorganization, D'Agostin was transferred to an Administrative Assistant position in BDO's Chicago practice office where she continued to report to Rieckmann. Although Coy and D'Agostin may have performed similar duties as Administrative Assistants, Coy and D'Agostin were not similarly situated because D'Agostin worked in the National Recruiting Group and had an established relationship with Rieckmann as her Administrative Assistant before the reorganization. In contrast, Coy worked for two employees whose positions, just like Coy's, were eliminated. As such, Coy and D'Agostin were not similarly situated with respect to the Administrative Assistant position that D'Agostin accepted after BDO's reorganization.

Finally, Coy was not similarly situated to Gillen. Gillen began at BDO as a National Meeting Planner/Manager in the CPD, where she managed training and professional education meetings. (*Id.* at ¶ 65.) Gillen was also the manager of BDO's travel program. (*Id.*) By the end of 1999, Gillen – who had eight years of prior experience in the travel management industry – spent fifty percent of her time on travel-related duties. (*Id.* at ¶¶ 66, 67.) During BDO's reorganization, Mebane decided that Gillen's Meeting Planner position was no longer needed, and Mooney, Director of Operations, decided that Gillen should manage BDO's travel programs on a full-time basis. (*Id.* at ¶¶ 68, 69.) In February 2000, Gillen accepted an offer to work as BDO's Travel Coordinator. (*Id.* at ¶ 70.) Unlike Gillen, Coy had no experience in travel management. Coy and Gillen were not similarly situated in regards to the travel management position that

Gillen accepted after BDO's reorganization.

## 2. Pretext

Although Coy's failure to establish a *prima facie* case justifies dismissal of her national origin discrimination claim, this Court will nonetheless address the pretext stage of the *McDonnell Douglas* analysis. BDO asserts that Coy was terminated due to company reorganization. According to Coy, an inference of pretext is raised by the fact that Rieckmann, D'Agostin, Shari Steele and Gillen were not terminated but were either transferred or had jobs created for them. However, because Coy has already failed to show that these four employees were similarly situated, her argument fails. Differences in treatment of employees who are not similarly situated cannot demonstrate pretext. *See Essex*, 111 F.3d at 1311.

Coy also argues that BDO's reason for her termination is pretextual because all the Senior Associates cut from the Human Resources department were minorities (Aguirre, Johnson-Carter, and Guttierez). Johnson-Carter, however, was not in the Human Resources department, and her position was eliminated when her work was outsourced months prior to Coy's termination. With respect to Gutierrez, the record does not offer information on her position or termination, other than that she was a receptionist. Aguirre worked in the Human Resources department, and her position was eliminated in the restructuring months prior to Coy's termination. The facts surrounding the termination of Johnson-Carter, Gutierrez and Aguirre do not discredit BDO's proffered reason for Coy's termination – her support position was eliminated when her supervisors' positions were eliminated. Therefore, we find that Coy does not produce evidence that BDO's proffered reason for her termination was pretext. We conclude that Coy was terminated, along with similarly situated non-Hispanics, because her position was legitimately eliminated in BDO's reorganization.

# CONCLUSION

In sum, all four Plaintiffs have failed to present the requisite evidence to proceed to trial and allow a reasonable jury to return a verdict in their favor. This Court is not unsympathetic to their claims and strongly believes it is unfortunate that BDO did not exhibit more patience and latitude with its minority employees. Yet, this Court must grant summary judgment to BDO against all four Plaintiffs – Robbin Johnson-Carter, Sandra E. Carter, Kendra Aguirre and Elizabeth Coy – because each of them failed to establish a *prima facie* case of discrimination or to demonstrate that BDO's reasons for its actions were pretext for discrimination.

Robbin Johnson-Carter fails to show that she was meeting BDO's legitimate expectations at the time of the alleged discriminatory treatment and termination or that similarly situated non-African-Americans were treated more favorably. Furthermore, Johnson-Carter has not come forth with evidence to discredit BDO's proffered reason that Johnson-Carter was terminated due to the outsourcing of her department's work; nor has she raised an inference of pretext on her other discrimination claims. In addition, the few comments that Johnson-Carter alleges to show a hostile work environment, however inappropriate or unpleasant, do not rise to the level to support this claim legally.

Sandra Carter fails to show that the actions she complains of constituted material adverse actions, that similarly situated non-African-Americans were treated more favorably, or that BDO's reasons for its actions were pretext. She also does not allege working conditions so intolerable as to sustain a constructive discharge claim.

Finally, both Kendra Aguirre and Elizabeth Coy fail to show that similarly situated non-protected class employees were treated more favorably during BDO's reorganization or that BDO's reasons for terminating their positions were pretext for intentional discrimination.

Therefore, BDO's motions for summary judgment against all four plaintiffs are granted in full. (R. 18-1, Johnson-Carter; R. 23-1, Coy; R. 10-1, Aguirre; R. 26-1, Carter.) The Clerk of the Court is directed to enter judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant and against Plaintiffs.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated: November 5, 2001**